## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

THE PILLSBURY COMPANY, a
corporation,

              Plaintiff,

    vs.

ZURICH AMERICAN INSURANCE
COMPANY, a corporation,

              Defendant.

_____

Court File No.  03-6560 DSD/SRN

**MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT**

## INTRODUCTION

In this action, The Pillsbury Company seeks insurance coverage for $12 million in losses caused by the malfunctioning of a sifter on an Ohio production line, which tore a hole in a plastic sifter screen.  Those small pieces of screen found their way into an unknown – and, as a practical matter, unknowable – number of cases of Pillsbury biscuit mix and products.  Pillsbury had no option but to destroy more than 600,000 cases of product because of the potential choking hazard posed by the pieces of plastic screen.

After nearly three years of investigation, Pillsbury's property insurer, Zurich American Insurance Company, denied about 95 percent of Pillsbury's claim for the losses from the biscuit incident.  This denial is premised on Zurich's eventual determination that the loss falls within the terms of a policy endorsement for seepage, pollution and contamination – a coverage position that had previously been rejected by both the

insurance company's adjuster responsible for Pillsbury's claim and Zurich's claims legal department. Under Zurich's current view, because Pillsbury's loss falls within the seepage/pollution/contamination endorsement, that coverage is subject to a $7.5 million deductible for the "peril of seepage and/or contamination."

Zurich has erred in its interpretation and application of both the pollution endorsement and the seepage/contamination deductible. Neither applies to Pillsbury's losses sustained in the biscuit incident. Pollution and contamination provisions of this type, as other courts have noted, are intended to apply to losses involving environmental pollution, not damage to an insured's commercial products. And the deductible applies only to the "peril" of seepage or contamination, not to contamination as a form of damage. At best, these policy provisions are ambiguous, and under Minnesota law must therefore be construed in favor of coverage. Moreover, even if these provisions were applied to the Pillsbury loss, their application is properly limited to only that portion of the destroyed product that actually had pieces of screen in it. The remainder of the loss would be covered under the policy's Consequential Loss provision, and would only be subject to the policy's general $100,000 deductible.

In this Motion, Pillsbury seeks a declaration from the Court that the pollution/seepage/contamination provisions in the Zurich policy do not apply to the biscuit incident, or, in the alternative, that they apply only to the small fraction of the product that was actually adulterated. These issues of contract interpretation are purely questions of law, and are ripe for adjudication on summary judgment.

## FACTUAL BACKGROUND

### I.    THE BISCUIT INCIDENT AND RESULTING LOSS TO PILLSBURY.

The facts that gave rise to Pillsbury's loss are undisputed. When pieces of plastic screen showed up in biscuit mix at a Pillsbury plant in Joplin, Missouri, it was a sign of a potentially larger problem. It was June 18, 2001, and the discovery set off an investigation that ultimately led to the destruction of more than 600,000 cases of Pillsbury biscuit products along with premix.

The problem was traced back to a Pillsbury facility in Martel, Ohio. The Martel plant produces mixes, primarily for use by other Pillsbury facilities. (Ex. 1).[1] Part of the process of making pre-mix involves sifting of ingredients through a screen made of Nytex – a plastic material similar to the screen of a tennis racket. (Ex. 2). When employees in Joplin found pieces of the plastic screen in their products, they called Martel. (Ex. 1). At that point, Martel employees began to get a sense of what had happened, though they did not yet fully grasp the scope of Pillsbury's problem.

When they learned about the plastic pieces in the mix at Joplin, Martel's maintenance staff connected the problem to a hole they had discovered in a Nytex screen that was replaced during an inspection on June 8, 2001. (Ex. 1). Bags of mix were sifted to see if they contained any plastic screen pieces. (Ex. 1). None was found, and because no one from any other Pillsbury plant had reported finding screen pieces in product,

---

[1] "Ex. _" shall refer to the exhibits to the Affidavit of Chad A. Snyder, which has been filed in support of Pillsbury's Motion.

production continued.  At the time, Martel employees concluded that the pieces of screen had been forced into a tailings bin and discarded.  (Ex. 1).

After the pieces of screen appeared in pre-mix at the Joplin facility, Martel employees took another look at the production line on which the screen had torn. Initially, they thought the problem was limited to production prior to the June 8 replacement of the screen, and so they continued to run the impacted production line. (Ex. 1).  However, on June 23, 2001, it occurred to Martel employees that some of the pieces of screen may have been retained in the ingredients that were re-fed into the production line where the screen had torn.  (Ex. 1).  They shut down that line until they could definitively determine whether it still contained screen pieces.  They inspected every piece of equipment on the line, and found no more screen.  (Ex. 1).  However, more pieces of screen were discovered in biscuits made in Joplin. (Ex. 1).

At this point, Pillsbury realized it had hundreds of thousands of cases of biscuit product that might contain choking hazards, i.e., pieces of screen.  Based upon the size of the hole in the screen, it was clear that there were not screen pieces in every case of biscuit product.  However, it was impossible for Pillsbury to determine which cases had screen pieces in them without re-sifting all of the biscuit product in every case – a costly and time-consuming process that, in the end, would have destroyed the product.  (Ex. 3).

The Pillsbury biscuit products are sold in lots (Ex. 4, pp. 92-93), and Pillsbury determined that entire lots had to be destroyed, even though the strands of screen were potentially present in only a small fraction of the cases in any given lot.  The Pillsbury Product Safety Group identified and located all of the Pillsbury products that had been

4

made with pre-mix from the impacted production line at the Martel plant between June 4 and June 23, 2001, by initiating a product trace, tracking the affected product through Pillsbury's production facilities, warehouses and customer shipments. (Ex. 5, p. 2). As a result of this effort, Pillsbury determined that 631,831 cases of finished goods had been made with mix from the impacted line. (Ex. 5, p. 3). Of those cases, 320,184 were still in Pillsbury's possession and the remaining 311,647 had been shipped to customers. (Ex. 5, p. 3). Pillsbury spent $5.2 million in product, freight and destruction costs to have 156,098 of the cases that had already been shipped to customers located and destroyed. [2] (Ex. 5, p. 3). In addition, Pillsbury destroyed all of the affected product it still had in its own facilities and warehouses (including 20,000 bags of pre-mix that had not yet been made into any Pillsbury biscuit product), at a cost of $5.5 million, and a loss of Pillsbury profits of $1.3 million. (Ex. 5, p. 3).

## II.    PILLSBURY'S INSURANCE CLAIM AND ZURICH'S RESPONSE.

At the time of the June 2001 biscuit loss, Pillsbury was owned by Diageo, Inc., a British company.[3] In 2000-2001, Diageo had a global property insurance program with Zurich U.K. that provided difference in conditions coverage for Pillsbury. However, because Pillsbury was a U.S. operation, Pillsbury also had its own local U.S. property

---

[2] The remaining 155,549 cases were never returned by customers, and are not part of Pillsbury's claim. (Ex. 5, p. 3).

[3] The Pillsbury Company was acquired by General Mills, Inc. in November 2001. (Ex. 4).

insurance policy issued by Zurich American Insurance Company.   (Ex. 6).   It is

undisputed that the local U.S. property policy applies to the Pillsbury biscuit loss.

On June 29, 2001, Pillsbury notified Zurich of the biscuit loss.   (Ex. 7).   In the

months that followed, Pillsbury continued to provide information to Zurich about its loss.

On May 17, 2002, Pillsbury submitted its formal claim in the amount of $12,298,191.

(Ex. 5).   For nearly the next two years, Pillsbury continued to provide additional

information and documentation to Zurich, in response to Zurich's requests and asked

Zurich to provide its response to Pillsbury's claim.   (Ex. 7).   Because Zurich failed to

provide a response to the claim, notwithstanding Pillsbury's repeated requests, Pillsbury

filed this lawsuit on December 31, 2003, for breach of contract.   It was not until April 8,

2004, in a letter from Zurich's outside adjuster that Zurich finally responded to

Pillsbury's claim.   Zurich rejected all but $678,295 of Pillsbury's claim.   (Ex. 8).   The

denial of 95 percent of Pillsbury's claim rested primarily on Zurich's assertions that:

1) Pillsbury had sustained a contamination loss within the meaning of the Zurich policy;

and 2) under the terms of a Renewal Certificate that Zurich claims should have been

issued with the 2000-2001 local U.S. policy, the deductible for a contamination loss was

$7,569,500.   Zurich also applied a second $151,390 deductible for withdrawal expenses.

That deductible appeared in Endorsement 5, which Zurich claims should also have been

issued as part of the 2000-2001 renewal of the local policy.   Zurich applied both

deductibles to a sum of $8,399,185 – the amount Zurich alleges falls within the scope of the local policy.[4]

## III.  THE TERMS OF THE POLICY, ENDORSEMENT 5 AND THE RENEWAL CERTIFICATE.

It is undisputed that the policy Zurich issued to Pillsbury insured Pillsbury "against all risk of physical loss or damage to property described herein, except as hereinafter excluded." (Ex. 6, ¶ 8).  It is also undisputed that the policy had a general deductible of $100,000.  (Ex. 6, ¶ 4(a)).  Zurich contends, however, that for the 2000-2001 policy renewal, the policy should have included two significant changes that reduce the coverage available to Pillsbury.  Zurich concedes that it issued the 2000-2001 policy without these provisions but seeks reformation of the policy because it alleges the omission of those changes was a "mutual mistake of fact." (Counterclaim, ¶ XXXXX).

The first of the new policy provisions Zurich claims should have been included in the policy is Endorsement 5, which amended the policy's seepage/pollution/contamination exclusion as follows:[5]

---

[4] The difference between Pillsbury's $12.3 million claim and Zurich's figure of $8.4 million consists primarily of disputes over the application of policy terms. That dispute over quantification of the loss is not a subject of this Motion.

[5] Paragraph 9(1) barred coverage "[a]gainst loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination, direct or indirect, arising from any cause whatsoever.  Nevertheless, if a peril not excluded from this policy arises directly or indirectly from seepage and/or pollution and/or contamination any loss or damage insured under the policy arising directly from that peril shall (subject to the terms, conditions and limitations of the policy) be covered." (Ex. 6, ¶ 9(1)).

CLAUSE 9 – PERILS EXCLUDED

sub-clause l is deleted and replaced by:

1.      Seepage and/or Pollution and/or Contamination Exclusion

Against loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination, direct or indirect, arising from any cause whatsoever.

Nevertheless this Policy is extended to include seepage and/or pollution and/or contamination, direct or indirect, arising from

  (1)    a Defined Peril
  (2)    other sudden unexpected accidental loss destruction or damage;
  (3)    the accidental use of contaminated raw materials;
  (4)    any of the perils or events referred to in a) and b) above which results from seepage and/or pollution and/or contamination.

Further, in the event of any product being contaminated (other than contamination which is caused maliciously with the intent to make a threat or demand) and not excepted under the terms of this Policy the amount payable hereunder shall be:

  (a)    As per the Valuation Clause other than in respect of product no longer belonging to the Insured where the basis of settlement shall be the cost of replacing the said contaminated product,
  (b)    The cost of withdrawal of the said contaminated product and any other product associated therewith including the cost of inspection destruction or disposal where necessary.

(Ex. 6).

The second policy change Zurich claims should have been included is the imposition of a deductible of $7,569,500 for losses caused by the peril of seepage and/or contamination. Zurich contends that this increased deductible – which appears in an

unsigned and undated Renewal Certificate – should have been included in the 2000-2001 policy:

> As respects the peril of seepage and/or contamination all losses, damages, or expenses arising out of any one Occurrence shall be adjusted as one loss and from the amount of such adjusted loss shall be deducted the sum of <u>$7,569,500</u>.

(Ex. 6).

## IV.    ZURICH'S ADJUSTMENT OF PILLSBURY'S CLAIM.

In the summer of 2003, Roger Watkins (a Zurich U.K. claims adjuster) asked Kevin McCoy, the manager of Zurich American's International Property Claims department, to review the Pillsbury loss.  (Ex. 9, p. 20).  McCoy was the most senior Zurich American employee responsible for the Pillsbury claim.  (Ex. 9, p. 8).  In September 2003, McCoy received a copy of the applicable policy from Zurich American's underwriting department.  (Ex. 9, p. 105).  However, the policy McCoy received from the underwriting department did not contain either Endorsement 5 or the Renewal Certificate with the $7.5 million deductible for seepage and contamination. (Ex. 9, p. 112).  McCoy prepared his first coverage analysis on October 2, 2003, based upon the terms of the policy without Endorsement 5.  (Ex. 9, p. 109).  In an e-mail on that day, he advised Watkins that Pillsbury's claim was covered by the local U.S. policy. (Ex. 10).

Sometime between October 2 and October 21, 2003, Zurich's underwriting department provided McCoy with a copy of Endorsement 5.  (Ex. 9, pp. 118-119).  After reviewing Endorsement 5, McCoy's analysis of Pillsbury's claim did not change.  He

maintained his view that the Pillsbury biscuit loss was insured under the Zurich policy, and did not fall within the contamination endorsement.  (Ex. 11).

The issue was revisited in late October because Watkins was quite certain that Zurich had intended on the 2000-2001 policy renewal to impose a high deductible on the pollution/seepage/contamination coverage provided under Endorsement 5.    (Ex. 11). Watkins was concerned, however, about Zurich's ability to prove that a higher deductible should apply, and in October 2003 he sent an e-mail asking McCoy if he could recommend good coverage counsel to address the matter.  (Ex. 11).  McCoy responded that he could, but that he did not believe retaining counsel was necessary because Endorsement 5's exclusion for pollution, seepage and contamination "does not apply to the loss at hand" and so he did not "believe we have a coverage issue based on the wording currently in hand."  (Ex. 11).  At his deposition in this case, McCoy testified that he wrote this e-mail because he did not see this as a contamination loss.  "It was an all-risk policy, and I didn't see any other exclusions which would bar coverage."  (Ex. 9, p. 119).  In McCoy's view, at the time, the loss, therefore, would not be subject to the higher deductible for pollution and contamination, even if Zurich could prove that deductible was supposed to be part of the 2000-2001 policy renewal.  (Ex. 9, p. 118).

McCoy reiterated his coverage analysis in a November 4, 2003 e-mail to Watkins, stating that his "analysis of the policy coverage was presented on October 2, 2003 and our claims legal department agreed with my analysis after their review on the 7th." (Ex. 12).  A month later, not having received a response, McCoy wrote Watkins again seeking direction on how to proceed with Pillsbury's claim.  (Ex. 13).  As of early

December 2003, he still was of the opinion that Pillsbury had not suffered a contamination loss, and that Endorsement 5 did not apply to the loss. (Ex. 9, pp. 135, 139). In fact, McCoy maintained his opinion that the contamination endorsement did not apply to the Pillsbury loss, and that Pillsbury's claim was subject to a $100,000 deductible, until at least December 29, 2003 – two days before the complaint was filed in this case. (Ex. 9, p. 140).

McCoy's and Zurich's claims legal department's interpretation and application of the contamination provision is consistent with Pillsbury's reading of the policy. Testifying as Pillsbury's Rule 30(b)(6) corporate designee, General Mills' Risk Manager John Weddle explained that Endorsement 5 was intended to address coverage for environmental pollution, and "this isn't a pollution loss." (Ex. 4, p. 67). He noted that General Mills had sustained similar losses – e.g. ground-up eyeglasses and a ground-up flashlight finding their way into products – and received insurance coverage under property insurance policies containing similar exclusions for "loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution, direct or indirect, arising from any cause whatsoever." (Ex. 4, pp. 75-76; Ex. 14). Zurich, in fact, was one of the insurers that made payments on those losses. (Ex. 15). None of the insurers, including Zurich, ever contended that the product affected by ground-up eyeglasses or by a ground-up flashlight was subject to the policy's pollution exclusion.

## ARGUMENT

Pillsbury's dispute with Zurich focuses primarily on the interpretation of the terms of the Zurich policy. Construction of an insurance contract is a question of law, and so is

properly addressed by the Court on a motion for summary judgment. *American National Fire Ins. Co. v. Cordie*, 478 N.W.2d 531, 533 (Minn. App. 1991). With this Motion, Pillsbury asks that the Court determine the proper application of the relevant terms of the Zurich policy to the undisputed facts of the biscuit incident, leaving the resolution of disputes over quantum for trial. Specifically, Pillsbury seeks an order declaring that:

1.   Pillsbury's loss is not subject to the pollution/seepage/contamination exclusion in Endorsement 5.

2.   Alternatively, even if the loss is subject to Endorsement 5, the $7.5 million deductible for the "peril of seepage and/or contamination" does not apply.

3.   Alternatively, even if both Endorsement 5 and the seepage/contamination deductible were applicable, they would apply only to those products that actually contained pieces of screen. The remainder of the product – the overwhelming majority – is insured under the policy's Consequential Loss provision, and subject to the general $100,000 deductible.

In making this Motion, Pillsbury does not concede that the parties intended to include either Endorsement 5 or the increased deductible in the 2000-2001 policy. To the contrary, Pillsbury disputes Zurich's claim for reformation, and does not believe Zurich will be able to muster the clear and convincing evidence it needs to prevail, as is required under Minnesota law. *Leamington Co. v. Nonprofits' Ins. Ass'n*, 615 N.W.2d 349, 354 (Minn. 2000). However, for the purpose of deciding Pillsbury's partial summary judgment motion it can be assumed, *arguendo*, and without prejudice that Endorsement 5 and the increased deductible are included in the 2000-2001 policy.

## I.    THE BISCUIT INCIDENT WAS NOT A CONTAMINATION LOSS.

At the center of this case is Zurich's post-suit contention that Pillsbury's loss was a contamination loss. Zurich's position that the presence of plastic screen pieces in a

fraction of the affected biscuit product falls within the scope of an exclusion for "seepage and/or pollution and/or contamination" losses finds no support in either law or the policy. Endorsement 5 is properly construed as limiting Pillsbury's insurance coverage for environmental losses, not as eliminating coverage for adulterated food products, some of which could present a potential choking hazard.

Several courts have taken this view when interpreting contamination exclusions in similar circumstances. Late last year, a New York appellate court considered a case in which an insurer sought to apply essentially the same exclusion to a loss involving soda. *Pepsico, Inc. v. Winterthur International American Ins. Co.*, 13 A.D.3d 599 (N.Y. App. Div. 2004). As here, the case arose out of the insured's need to destroy thousands of cases of its product – Mountain Dew and Diet Pepsi – that were made unmerchantable by the presence of improper or tainted ingredients. *Id.* at 599. The insurer denied coverage, relying upon an exclusion stating that the policy "does not insure against loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination, direct or indirect, arising from any cause whatsoever." *Id.* at 600. The insurer based its argument on what it regarded as "the plain meaning of the word 'contaminate,' which is to make inferior or impure by mixture." *Id.* at 599. The appellate court, affirming the trial court, held that the exclusion "does not apply to exclude the alleged losses claimed by Pepsico, which are non-environmental in nature." *Id.* at 600. The court stated that the insurer's interpretation of the exclusion (which is the same as that advanced by Zurich in this case) "ignores the general purpose of pollution exclusions, which is to exclude coverage for environmental pollution." *Id.*

The Ninth Circuit, in *Enron Oil Trading & Transportation Co. v. Walbrook Ins. Co. Ltd.*, 132 F.3d 526 (9th Cir. 1997), took the same view of a contamination exclusion. That case involved foreign materials that had been injected into the insured's oil before it was sold.  The insurers denied the insured's claim for loss caused by the presence of the foreign substances in the oil product, based upon an exclusion for loss "directly or indirectly caused by seepage, pollution or contamination." *Id.* at 529.  The Ninth Circuit rejected the insurers' position, holding that the exclusion – and particularly the term "contamination" within the exclusion – "is an environmental term of art and applies only to discharges of pollutants into the environment." *Id.* at 530.

Endorsement 5 of Zurich's policy in this case should be interpreted the same way. It applies only to environmental losses.  This reading of Endorsement 5 is bolstered by the terms of the provision, and particularly the context in which the term "contamination" appears.  Applying the concept of *ejusdem generis*,[6] "courts often look at the greater context or purpose of a clause in order to determine its meaning." *General Mills, Inc. v. Gold Medal Insurance Company*, 622 N.W.2d 147, 153-154 (Minn. App. 2001).  For example, in *Wyatt v. Northwestern Mutual Ins. Co. of Seattle*, 304 F. Supp. 781 (D. Minn. 1968), the court was asked to determine whether a homeowner's policy exclusion for "earth movement, including but not limited to earthquake, landslide, mud flow, earth sinking, rising or shifting" applied to the collapse of the insured's basement.  The

---

[6] Under the doctrine of *ejusdem generis* "when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed." BLACK'S LAW DICTIONARY (7th ed. 1999).

collapse resulted from excavation work being done on a neighboring property. The insurer took the position that "earth movement" meant any and all shifting or movement of earth. The court rejected this argument, and adopted the reasoning of a Louisiana court that had confronted the same question: "Under the *ejusdem generis* doctrine, the words 'earth movement' as used in the policy must be construed as embracing the same general kind, class or nature of peril as its companion words 'earthquake' and 'landslide.'" *Id.* at 784 (quoting from *Anderson v. Indiana Lumbermans Mut. Ins. Co.*, 127 So2d 304, 308 (La. App. 1961)). The court held that if the insured's loss was not caused by a natural disaster in the nature of an earthquake or landslide, the exclusion would not apply. *Id.* The Minnesota Court of Appeals adopted the same reasoning in *Henning Nelson Construction Co. v. Fireman's Fund Am. Life Ins. Co.*, 361 N.W.2d 446, 450 (Minn. App. 1985).

The term "contamination" in Endorsement 5 of the Zurich policy must likewise be defined by its context. It is a general, undefined term that is immediately preceded by the terms "seepage" and "pollution," and should "be construed as embracing the same general kind, class or nature of peril as its companion words." That class of peril, as the *Pepsico* court observed, is "environmental pollution." 13 A.D.3d at 600. Similarly, the First Circuit, after considering an analogous exclusion for the discharge, dispersal or "seepage" of "pollutants," held that the exclusion was most reasonably read as "applying only to environmental pollution." *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 30 (1st Cir. 1999). Zurich's exclusion for seepage, pollution and contamination falls into the same category, and should likewise be limited to apply only to environmental pollution.

Finally, even assuming, *arguendo*, that an exclusion for seepage/pollution/contamination could be reasonably read as applying to pieces of a plastic screen breaking off and working their way into some food products – as Zurich contends – that is by no means the only reasonable reading.  At best, it would be one of multiple reasonable readings, rendering the provision ambiguous.   A policy term is ambiguous "if it is reasonably subject to more than one interpretation."  *American Commerce Ins. Brokers, Inc. v. Minnesota Mutual Fire and Casualty Co.*, 551 N.W.2d 224, 227 (Minn. 1996).  Under Minnesota law, if an insurer cannot demonstrate that its reading of a policy term is the <u>only</u> reasonable reading, the ambiguity is resolved in favor of coverage.  *Auto-Owners Ins. Co. v. Newmech Cos., Inc.*, 678 N.W.2d 477, 483 (Minn. App. 2004).  Exclusionary language, in particular, is disfavored under Minnesota law, and an insurer seeking to avoid coverage on the basis of an exclusion bears the burden of proving that the exclusion applies to the loss.  *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 313-314 (Minn. 1996).  "Exclusions are to be strictly interpreted against the insurer and an insurer denying coverage because of an exclusion bears the burden of proof."  *Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 326 (Minn. 1993).  Such narrow construction is particularly appropriate "in the absence of any definition of material terms,"[7] as in this case, where Zurich chose to leave the term "contamination" undefined in the policy.

---

[7] *General Mills,* 622 N.W.2d at 153.

Zurich cannot meet its burden of showing that its interpretation of Endorsement 5's provisions for contamination/pollution/seepage is the only reasonable interpretation for the simple reason that there are other reasonable interpretations. As noted above, courts have interpreted similar language as applying only to environmental losses. That is the same reading that John Weddle, Zurich's Kevin McCoy, and Zurich's claim legal department gave Endorsement 5. This interpretation is further supported by the fact that similar General Mills losses have been paid under similar policies without any insurer claiming either loss was an excluded contamination loss. Perhaps most compelling is Zurich's own internal interpretation and application of the exclusion. The fact that Zurich's senior adjuster on the claim, as well as its own claims legal department, read the provision as having no application to the Pillsbury loss is compelling evidence that Endorsement 5 can, in fact, be reasonably read as having no application to the Pillsbury loss. So long as there is a reasonable reading of the exclusion that favors coverage, that is the reading that must be applied by the Court. *Marshall Produce Co. v. St. Paul Fire and Marine Ins. Co.*, 98 N.W.2d 280, 283 (Minn. 1959).

## II.    THE $7.5 MILLION DEDUCTIBLE DOES NOT APPLY EVEN IF THIS WAS A CONTAMINATION LOSS UNDER ENDORSEMENT 5.

Even if Zurich could show that the Pillsbury biscuit loss falls within the scope of Endorsement 5, the $7.5 million deductible for the "peril of seepage and/or contamination" would not apply because the loss was not caused by the peril of contamination. The loss was caused by the tearing of a plastic screen on a sifter at the Martel plant.

A comparison of the language in the Renewal Certificate's deductible provision with the language of Endorsement 5 reveals that the alleged $7.5 million deductible is much narrower in scope and only applies in limited circumstances. Endorsement 5 is quite broad, excluding coverage for "losses" connected with "any kind" of pollution or seepage or contamination, "direct or indirect, arising from any cause whatsoever." (Ex. 6). The limited give-back in coverage in the exception to the exclusion is similarly broad, extending coverage "to include seepage and/or pollution and/or contamination, direct or indirect, arising from" one of the delineated causes. (Ex. 6).

By contrast, the deductible provision in the Renewal Certificate limits its application only to "the peril of seepage and/or contamination." (Ex. 6). There is a distinction "between a risk or peril insured against under the insurance policy, *i.e.*, the cause of the loss, and the damages or recovery sought as a result of the occurrence of that risk or peril." *Fireman's Fund Ins. Co. v. Tropical Shipping and Construction Co., Ltd.*, 254 F.3d 987, 1006 (11th Cir. 2001). A loss, as described in the language of Endorsement 5, is the damage. A peril, by contrast, is, "[i]n general, the cause of any loss." BLACKS LAW DICTIONARY (7th Ed. 1999).

Pillsbury's loss was not <u>caused by</u> contamination. The loss was caused by a tear in a plastic screen, the malfunctioning of a machine. That malfunction caused the biscuit product to be affected in a manner that, according to Zurich's reading of the policy, took the form of contamination. However, even under Zurich's reading, contamination is the loss or damage only, not the peril that caused the biscuit product to be damaged. As the

$7.5 million deductible in the Renewal Certificate applies only to the peril of contamination, it has no application to Pillsbury's claim.

## III.    UNDER NO CIRCUMSTANCES COULD THE $7.5 MILLION DEDUCTIBLE APPLY TO PRODUCT THAT WAS NOT CONTAMINATED.

The $7.5 million contamination deductible, if it applies to this loss at all, applies only to the loss associated with the product that actually contained pieces of screen. That was only a small fraction of the product that Pillsbury had to destroy. The remainder of the product – the vast majority of the lots – was not contaminated, but had to be destroyed because it was among the same lots as the cases that likely contained pieces of screen. The undamaged product that had to be destroyed is insured under the Zurich policy's Consequential Loss provision, which states:

This policy insures against:

* * *

b.    the reduction in value to the remaining part or parts of any lot of merchandise or other insured property usually sold by lots or sizes, color ranges, or other classifications due to damage to or destruction of a part of such lots or other classifications due to a peril insured against.

(Ex. 6, ¶ 31). Zurich's senior claims person, McCoy, acknowledged in his deposition that under this provision, "an insured is entitled to recover for property that is not physically damaged but loses its value because of physical damage to other insured property because of a peril insured against." (Ex. 9, p. 145).

That is precisely the nature of the majority of Pillsbury's loss. More than 600,000 cases of product had to be destroyed as a result of the malfunction of the Martel sifter. At

most, only a few thousand of those cases actually contained contaminated products. The remaining cases lost their value, not because they were physically damaged, but because it was impossible to distinguish the damaged biscuit products from the undamaged. Thus, damage to a small fraction of the product made all of the product worthless.

The Renewal Certificate's alleged $7.5 million deductible, if it applies to this loss at all, applies only to the biscuit product that was actually damaged. It does not apply to losses insured under the Consequential Losses provision. Pillsbury is therefore entitled to a declaration that the $7.5 million deductible applies only to the loss for the product that was actually contaminated, and the loss of the remaining uncontaminated product is subject to the policy's general $100,000 deductible.

## CONCLUSION

In denying 95 percent of Pillsbury's claim, Zurich misread and misapplied its policy. In 2003, Zurich's own adjuster and claims legal department correctly determined Pillsbury's loss was insured, and was not subject to the seepage/pollution/contamination provisions of Endorsement 5. Nothing has happened to justify Zurich's subsequent change of heart, and this Court should grant Pillsbury's Motion and declare that the biscuit incident loss does not fall within Endorsement 5.

Moreover, Zurich compounded its erroneous application of Endorsement 5 by then applying a deductible that, by its terms, applies only to losses caused by the "peril of seepage and/or contamination." Pillsbury's loss was not caused by either seepage or contamination, and the Court should likewise rule that the Renewal Certificate's $7.5 million deductible has no application to this loss.

And finally, the vast majority of Pillsbury's loss was to product that was not actually damaged, but had to be destroyed because it was produced in the same lots as damaged product. That loss falls within the Consequential Loss provision of the policy. As such, it is subject to only the $100,000 deductible, regardless of whether the remaining product was "contaminated" for purposes of either Endorsement 5 or the Renewal Certificate's increased deductible.

DATE: July 13, 2005                    Respectfully submitted,

                                       **ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP**


                                       By:        s/ Chad A. Snyder
                                              Lawrence Zelle
                                              Patricia St. Peter
                                              Chad A. Snyder
                                       500 Washington Avenue South, Suite 4000
                                       Minneapolis, MN 55415
                                       Telephone: (612) 339-2020
                                       Facsimile: (612) 336-9100