# EXHIBIT D

COPY

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF MINNESOTA
 3
    THE PILLSBURY COMPANY, a corporation, )
 4                                        )
               Plaintiff,                 )
 5                                        )
         vs.                              ) 03-6560 DSD/SRN
 6                                        )
    ZURICH AMERICAN INSURANCE COMPANY,    )
 7                                        )
               Defendant.                 )
 8
 9
10            The deposition of KEVIN McCOY, called by
11   the Plaintiff for examination, pursuant to notice and
12   pursuant to the Rules of Civil Procedure for the
13   United States District Courts pertaining to the taking
14   of depositions, taken before Erin McLaughlin, CSR, at
15   10 South LaSalle Street, Suite 1600, Chicago,
16   Illinois, on Monday, April 18, 2005, commencing at the
17   hour of 9:30 o'clock a.m.
18
19
20
21  Reported for
    LAKE SHORE REPORTING SERVICE, by
22  Erin McLaughlin, CSR
23
24
```

1    sure that what underwriting had given to you
2    accurately contained all of the terms and conditions
3    that Zurich and Diageo had agreed to for the renewal
4    of the local policy to be effective July 1, 2000?
5         A    Yes. I did. The result of that follow-up
6    was the renewal certificate declaration that was
7    attached to the '99 to 2000 policy language.
8         Q    Did you receive Endorsement 5 at the same
9    time?
10        A    Yes.
11        Q    And is there any reason why you don't
12   mention Endorsement 5 in your October 2nd, 2003
13   coverage analysos which we have marked as Exhibit 18?
14        A    Because I didn't have that information at
15   the time that the analysis of October the 2nd was
16   done.
17        Q    My analysis on the October the 2nd e-mail
18   was based upon the terms and conditions of the 1999
19   through 2000 policy year. Not until after the
20   analysis was completed did I receive a copy of the
21   renewal certificate declarations which were dated,
22   which were for the policy term of July 1, 2000 to July
23   1, 2001. In other words, I received the policy
24   separately from the renewal declarations that were

1   attached to it.

2   Q   You received the policy separately from
3   the renewal declarations that were attached to it.  To
4   what, sir?

5   A   To the policy format, policy form of 1999
6   to the year 2000.  The terms and conditions of the
7   1999 to 2000 policy year did not change with the
8   exception of the endorsements that were attached to
9   the policy for the policy year of January 1 -- excuse
10  me, of
11  July 1, 2000 to July 1, 2001.

12  Q   Isn't it correct, sir, in addition to the
13  endorsement the deductible amount changed for
14  pollution and contamination; correct?

15  A   That's a part of the endorsement.  The
16  deductible is a part of the endorsement.  $7.5 million
17  deductible, is that the deductible you are
18  referencing?  That is contained on the first page of
19  the renewal certificate declarations.

20  Q   All right.  So when you use the word
21  endorsement, you are including the actual renewal
22  certificate declarations?

23  A   Yes.

24  Q   As opposed to those policy provisions that

1   reviewing the master policy) presumably is contained
2   in the master policy. No such wording is contained in
3   the local policy.
4              Is that an accurate statement of the
5   wording that was in the local policy that you were
6   given by Zurich U.S. underwriting?
7       A    Yes, with reference to the 10 million
8   pound limitation for pollution, seepage,
9   contamination.
10      Q    And the deductible that was contained on
11  the local policy that you were reviewing as of October
12  22nd, 2003, the amount of the deductible was $100,000;
13  correct?
14      A    That's correct, under the general terms
15  and conditions of the policy.
16      Q    Because in your view, this was not a
17  pollution and contamination loss?
18      A    Yes, as of October the 21st, 2003.
19      Q    When did you change your mind and decide
20  this was a pollution and contamination loss?
21      A    It either would have been in late 2003 or
22  early 2004.
23      Q    Was it before the lawsuit was filed or
24  after the lawsuit was filed?

1      A   The lawsuit was filed on the 31st of
2  December which would have had no bearing on what the
3  analysis would have been, but either it would have
4  been late 2004 or early 2005.

5      Q   After the suit had been filed?

6      A   I'm not sure if it was after or before the
7  suit was filed. I'm sure there was probably
8  correspondence within the file that would reflect
9  that, but I do not recall what the date was.

10     Q   What prompted you to change your
11 conclusion that this loss was a contamination
12 pollution loss?

13     A   Based on my further understanding of what
14 the particulars of the loss was and how Endorsement
15 Number 5 and the renewal certificate declarations was
16 intended to address these types of claims.

17     Q   You're talking about the limitations on
18 Pillsbury's claim; correct?

19     A   Yes, the limitations and the actual
20 pollution, seepage, contamination endorsement which
21 was attached to the renewal declarations page of the
22 policy year of 2000 to 2001.

23     Q   Well, sir, if you look at Exhibit Number
24 20, the bottom e-mail, isn't it correct, sir, that as

```
 1        Q    Have you seen paragraph 31 in any other
 2   policy Zurich has issued?
 3        A    Yes. I have.
 4        Q    Have you seen it more than once?
 5        A    Yes.
 6        Q    Is this type of provision, a consequential
 7   loss provision an unusual provision in a property
 8   insurance policy?
 9        A    No. I wouldn't say it's unusual.
10        Q    I'm sorry?
11        A    I would not say it's unusual.
12        Q    Am I correct, sir, that under this
13   provision of the Zurich policy an insured is entitled
14   to recover for property that is not physically damaged
15   but loses its value because of physical damage to
16   other insured property because of a peril insured
17   against?
18        A    Yes. That would be the intent.
19        Q    Give me a moment. I'm going to go through
20   my notes. I may be close to wrapping up.
21
22                  (Whereupon a brief recess was had,
23                   after which the deposition of
24                   Mr. McCoy continued as follows:)
```

```
1        A    Yes.  That's correct.
2        Q    And this is a certified copy of the
3   policy?
4        A    Yes.
5        Q    And you had Exhibit 2, a certified copy of
6   the policy obviously before the position letter was
7   sent to the insured dated April 8, 2004?
8        MS. ST. PETER:  Object to the form of the
9   question.
10       A    Yes.  That's correct.
11       MR. HOEY:  Q  Now, Endorsement 5 of Exhibit 2,
12  why don't you tell me what it does with regard to
13  Clause 9?  Put it in layman's terms for us.
14       A    Under the basic terms and conditions of
15  the policy, seepage, pollution, contamination is
16  excluded from coverage.  Endorsement 5 actually
17  replaces the exclusion that's contained in the main
18  body of the policy and does grant coverage for
19  seepage, pollution and/or contamination.
20       Q    In Endorsement 5, in order to bring the
21  seepage, pollution, contamination coverage back into
22  the policy, do certain requirements have to be met?
23       A    Yes.
24       Q    And are those requirements one through
```

1    MR. HOEY:  Q  Did you come to learn that
2    Pillsbury had had a prior loss involving taco shells?
3        A    Yes. I did.
4        Q    Did you have any understanding as to
5    whether or not that loss was treated as a
6    contamination loss?
7        A    Yes. I believe so, yes.
8        Q    Now, with regard to the deductible of
9    approximately 7.5 million U.S. dollars for seepage,
10   pollution, and contamination, is that reflected on the
11   renewal certificate declaration?
12       MS. ST. PETER:  Objection: Form of the
13   question.
14       A    Yes. It is.
15       MR. HOEY:  Q  And could you read for us where
16   that is reflected.
17       A    Towards the end of the middle page, middle
18   of the page as respects the peril of seepage and/or
19   contamination, all losses, damages, or expenses
20   arising out of any one occurrence shall be adjusted to
21   one loss and the amount of such adjusted loss shall be
22   deducted the sum of $7,569,500.
23       Q    Now, you mentioned application of another
24   deductible. That's in Endorsement 5; right?

1    view Pillsbury's loss arose out of a single
2    occurrence; correct?
3         A    Yes.
4         Q    You made reference to another loss
5    suffered by Pillsbury, the taco shells loss; correct?
6         A    Yes.
7         Q    Did you handle that particular claim?
8         A    No.
9         Q    Who did?
10        A    Dennis Fox.
11        Q    Did you have any conversations with Dennis
12   Fox about the biscuit claim?
13        A    Nothing than one trying to get from him a
14   copy of a policy, if he had the policy during that
15   time; and that's pretty much it.  He was aware that
16   Pillsbury did have another claim in the Martel, Ohio
17   plant.
18        Q    Mr. Fox did provide you with a portion of
19   a policy as we saw in one of the e-mails; correct?
20        A    Yes.
21        Q    What is your understanding of what the
22   circumstances were of the taco shells loss?
23        A    We didn't get into details regarding that
24   claim.

1   Q   You have no understanding as to how the
2   taco shell product became adulterated?
3   A   No.
4   Q   Now, I believe you also testified that
5   Exhibit 32 was prepared using the certified copy of
6   the policy that Catherine Lundgren prepared on
7   March 11, 2004 that's been marked as Exhibit Number 2;
8   correct?
9   A   Yes.
10  Q   As of December, 2003, did Zurich have in
11  its files a copy of what we have marked here as
12  Exhibit Number 2?
13  A   I don't think so, no. I don't think it
14  came until afterwards, until the end of 2003.
15  Q   And by it came, you're talking about the
16  certified copy of the policy?
17  A   Yes.  The policy, yes.
18  Q   When did Ms. Lundgren actually physically
19  put together what has been represented as a certified
20  copy of the policy to be effective from July 1, 2000
21  to July 1, 2001?
22  A   There is a copy of the certified policy,
23  sometime in 2004.
24  Q   Over two years after the Pillsbury loss